Filed 10/27/16

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>JESUS NAVARETTE,<br><br>    Defendant and Appellant. | F069534<br><br>(Super. Ct. No. VCF286530)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  H. N. Papadakis, Judge.

Gordon S. Brownell, under appointment by the Court of Appeal, for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Max Feinstat, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I and II of the Discussion.

Jesus Navarette appeals from his convictions and sentence for infliction of corporal injury on a cohabitant or coparent, false imprisonment, making criminal threats, attempting to dissuade a witness from testifying, and dissuading a witness from prosecuting a crime. He contends the trial court abused its discretion in admitting evidence of a prior domestic violence arrest under Evidence Code section 1109, a claim we reject. He also argues the court erred in not applying Penal Code[1] section 654 to his sentence for dissuading a witness from prosecuting a crime. The People concede the point, and we agree. Finally, Navarette challenges the trial court's finding that his prior conviction for a homicide offense in the State of Sinaloa, Mexico, constituted a serious felony within the meaning of the serious felony sentence enhancement statute, as well as the three strikes law. We conclude that, under applicable state and federal law, the trial court's finding as to Navarette's prior conviction is not supported by substantial evidence. Accordingly, we strike the trial court's finding. The matter is remanded for resentencing consistent with this opinion. The judgment is affirmed in all other respects.

## *FACTS AND PROCEDURAL HISTORY*

On March 13, 2014, Navarette was charged by a first-amended information filed in the Tulare County Superior Court with attempted second-degree robbery (count 1, §§ 211, 664); assault with a firearm (count 2, § 245, subd. (a)(2)); criminal threats (count 3, § 422); attempting to dissuade a witness from testifying (count 4, § 136.1, subd. (b)(2)); and dissuading a witness from prosecuting a crime (count 5, § 136.1, subd. (b)(2)). The information alleged as to counts 1, 2, and 3 that Navarette personally used a firearm (§ 12022.53, subds. (a), (b) & (c)) and also alleged as to all counts that he had a prior strike conviction (§§ 667, subds. (b)-(i) & 1170.12, subds. (a)-(d)) and a prior serious felony conviction (§ 667, subd. (a)(1)) in that he had been convicted of murder in the State of Sinaloa, Mexico, in 2006.

---

[1]Subsequent statutory references are to the Penal Code unless otherwise specified.

The matter proceeded to jury trial on April 1, 2014.  On April 3, 2014, the court granted a defense motion to dismiss count 1; count 2 was dismissed by the People.  The court also granted the prosecution's oral motion to amend the information to add a count of infliction of corporal injury on a cohabitant or coparent (count 6, § 273.5, subd. (a)), a count of false imprisonment (count 7, § 236), as well as allegations, with respect to each of these counts, that Navarette personally used a firearm (§ 12022.5, subd. (b)(2)).  That same day, the jury found Navarette guilty on counts 3 through 7 and found the special firearm allegations related to counts 3, 6, and 7 to be true (the judge subsequently ordered the firearm allegations to be "modified by interlineation to PC12022.5(a)").

On April 11, 2014, the court found true the prior strike allegations as to counts 3, 4, and 5; however, the court subsequently appeared to indicate that the strike prior applied to "each of the counts" of conviction notwithstanding that it was only alleged in connection with counts 3, 4, and 5.  Although the court did not expressly address the prior serious felony allegation, the minute order of the proceedings reflects that the court found it true as to counts 3 and 4.

On June 4, 2014, the court sentenced Navarette to an aggregate term of 27 years in prison.  The court imposed a term of 23 years on his conviction for infliction of corporal injury to a cohabitant or coparent in count 6, as follows:  the upper term of four years, doubled to eight years based on the strike prior (§ 1170.12, subd. (c)(1)), plus a consecutive five-year term based on the prior serious felony conviction (§ 667, subd. (a)(1)), and a consecutive 10-year term for the firearm enhancement (§ 12022.5, subd. (a)).  The court further imposed consecutive sentences of 16 months (1/3 the midterm, doubled on account of the strike prior) for Navarette's convictions in counts 3, 4, and 5.  Finally, the court sentenced Navarette to the upper term of six years on his conviction for false imprisonment in count 7, which was stayed pursuant to section 664 (this six-year term evidently reflects a doubling of the upper term based on the strike

3.

prior). (See § 237, subd. (a) [punishment for false imprisonment by violence or menace].)

### *Factual summary*

On the night of August 3, 2013, Navarette followed his ex-girlfriend, Anami Alvarado, as she drove home from the store. He contacted her by cell phone asking her to pull over, which she did.[2] Navarette approached her car carrying a rifle, demanded she get out of the car, and attempted to grab her car keys from the ignition. When Alvarado resisted, Navarette punched her on the left side of her face and, as she drove off, fired two rounds into the ground. Alvarado contacted the Tulare County Sheriff's Department and gave a statement against Navarette. Navarette was then arrested, jailed, and charged in the instant case.

Navarette subsequently threatened Alvarado from jail, over the phone, in letters, and during personal visits. He explicitly directed Alvarado to drop the charges and told her how to change her prior description of events should the case proceed to trial. At trial, Alvarado testified as directed by Navarette, but her prior statements to law enforcement personnel were presented to the jury through the testimony of the relevant personnel.

### *Alvarado's trial testimony*

Alvarado began a relationship with Navarette in 2008. They lived together in Earlimart off and on and were the parents of a two-year-old daughter. Although not legally married, Alvarado considered Navarette her husband. Eventually they separated.

After they separated, on the evening of August 3, 2013, Alvarado drove to Earlimart with her daughter to buy food. On the way home, she noticed a white car following her with Navarette in the passenger seat.

---

[2]The People, in their recitation of the facts, state that "[Navarette] sent Alvarado a text asking her to stop …." It is not clear from the record whether the contacts were by oral or text communications.

4.

Navarette contacted her by cell phone telling her to stop. She complied, pulling over by a house in Teviston. As Navarette approached, she lowered her window halfway. Navarette told Alvarado he wanted to reconcile and asked her to turn the car off and to get out. Alvarado did not turn the car off or get out. Navarette stuck his hand through the window, asking her to lower it so they could speak. Alvarado did not want to speak to him and pushed his hand away.

Navarette then tried to open Alvarado's car door but it was locked. He grabbed Alvarado's arm as they continued to argue. Alvarado's car was blocked by the white car and some trash cans. A man came out of the driver's side of the white car carrying a rifle. Alvarado recognized him as one of Navarette's friends. The man argued with Navarette then shot the rifle in the air twice. Navarette and the man then got back in the white car. Alvarado fled in her car.

Alvarado drove to the Pixley sheriff's station. On the way there, she called 911. She remembered speaking to Deputy Cruz at the sheriff's station but did not remember the details of the conversation because she was very nervous. She denied telling Deputy Cruz that Navarette reached into her vehicle and tried to remove the keys. She denied that Navarette punched her in the left side of the face and that he fired the rifle into the ground. She denied telling Deputy Cruz that Navarette told her he would kill her father that evening. Alvarado also denied that Navarette had called her while she was at the sheriff's station.

Alvarado denied that Navarette called her from jail on August 6, 2013, directing her to refuse to testify against him and to tell the police he did not fire the rifle. Alvarado stated she had spoken to Navarette while he was in jail and had visited him there.

Alvarado also denied that she told the Tulare County District Attorney's Office Investigator Martha Rodriguez that she was afraid of Navarette hurting her if he got out of jail. She denied telling Investigator Rodriguez that Navarette had been offered a job running a drug trafficking operation and that he had threatened to use hit men under his

control to kill her family in Mexico. She also denied telling Investigator Rodriguez that when she went to visit Navarette he would hold drawings up to the window with messages written at the bottom regarding how she should testify in court.

***Other prosecution evidence***

On August 3, 2013, Tulare County Sheriff's Deputy Nathan Cruz was dispatched to the intersection of Avenue 72 and Road 132 in Teviston to investigate a report of shots fired. Shortly thereafter, Alvarado arrived at the sheriff's station in Pixley and Deputy Cruz returned to talk to her.

Alvarado told Deputy Cruz that Navarette was her ex-boyfriend. Earlier that evening, Alvarado went shopping in Earlimart. While she was in the store, she received a call from Navarette. Navarette told Alvarado that he wanted to talk. Alvarado declined as their relationship had ended in July 2012. Navarette said he would follow her and she should "watch her back."

Alvarado left the store to return home, taking a route that she did not normally use. She got another call from Navarette when she was near the intersection of Avenue 72 and Road 132 in Teviston. Navarette told her he was in the car behind her and she should pull over. Alvarado saw a white Ford Mustang behind her.

Alvarado pulled over in the vicinity of the intersection, and the white Mustang stopped behind her. Navarette got out of the passenger side, holding a rifle. Navarette came to the driver's side of Alvarado's car and told her to get out. When Alvarado refused, he reached through the window with his left hand and tried to grab the car keys out of the ignition. Alvarado pushed his hand out of the car. Navarette punched her on the left side of her face. She put the car in gear. Navarette fired two rounds from the rifle toward the ground. He told Alvarado he would kill her father later that night. Alvarado drove away quickly. As she did, she saw Navarette throw shell casings onto a property with an open gate. During the encounter, Alvarado's daughter was in the back seat of the car.

As Alvarado was talking to Deputy Cruz, her cell phone rang. She told Deputy Cruz the caller was Navarette. Alvarado answered the phone and put it on speaker. Navarette said, in Spanish, "You fucking bitch, don't be rolling around town without my permission." Alvarado told Navarette their relationship was over and to leave her alone.

Alvarado told Deputy Cruz she was afraid for her life. She appeared fearful to Deputy Cruz. She also had a bump and redness on her left cheek below her eye. Alvarado informed Deputy Cruz that Navarette lived on Cedar Avenue in Earlimart. Deputy Cruz went to Navarette's residence and arrested him.

On August 16, 2013, Deputy Cruz called Alvarado. She informed him she no longer wanted to cooperate with the investigation and refused to meet with him. She also demanded that the charges brought against Navarette be dropped.

Abraham Chavez lived near Road 132 and Avenue 72 in Teviston on August 3, 2013. Around 8:00 or 9:00 p.m., he was sitting on the porch in front of his house; he heard a man and woman arguing. The man told the woman to "get inside" and the woman responded "no." The man also told the woman, in Spanish, "Bitch, get the fuck off the car." A few seconds later Chavez heard a gunshot. The man and woman left in separate cars. One of the cars was a white Mustang. Maricruz Chavez, Abraham's wife, also heard the argument and a gunshot.

Tulare County Sheriff's Deputy Anthony Young was dispatched to the location in Teviston where the shooting occurred. He was taking Chavez's statement when Deputy Cruz called to tell him that Navarette had thrown shell casings nearby. Deputy Young searched the property near the intersection and found a 7.62 x 39 shell casing beyond the open gate. That caliber of shell is commonly used in an AK-47 rifle.

On August 6, 2013, Navarette made two calls to Alvarado from jail. Investigator Rodriguez obtained a recording of the calls. She played one of the calls for Alvarado. Alvarado identified the woman's voice as her own and the other voice as Navarette's. In the call, Navarette told Alvarado to try to contact the court and explain that "she did not

7.

have anything against him, that they did not argue, that he did not hit her." Navarette also said, "if they try to bring you in, you tell them, 'No, I do not have a reason to go. I don't want to go. I don't have to go.'" Navarette told Alvarado he was facing charges of domestic violence and criminal threats and asked her to say that the charges were unfounded.

Investigator Rodriguez subsequently spoke to Alvarado on February 18, 2014. Alvarado told her she was afraid of Navarette. She was concerned that, were Navarette deported to Mexico, he would harm her daughters who lived there. On March 21, 2014, Rodriguez again met with Alvarado, who did not want to be seen meeting with Rodriguez. Earlier that day, Alvarado had visited Navarette in jail. He told her he had been offered a drug-trafficking job by a person known to Alvarado and would have hit men under his control. Alvarado cried during the conversation; she was worried about the safety of family members who lived in Sinaloa, Mexico. She believed that Navarette wielded power both inside and outside the walls of the jail and, consequently, she was fearful of cooperating with law enforcement.

On April 1, 2014, Alvarado gave Investigator Rodriguez two letters that Navarette had sent her; she did not want Rodriguez to disclose that she had obtained the letters from Alvarado. A court interpreter read the letters, in translation, to the jury. In one letter, Navarette directed Alvarado to testify, in connection with the Teviston incident, that another man was driving the car that Navarette had pulled up in and that it was the other man who fired the rifle. In the other letter, Navarette repeated that Alvarado should testify that the other man fired the rifle and disposed of the shell casings; he also told her to clarify that he did not hit her. Alvarado also told Rodriguez that, during jail visits, Navarette would hold up drawings he had made for their daughter. The drawings incorporated messages from Navarette to Alvarado regarding how he wanted her to testify in court.

8.

***Section 1109 evidence***

Officer Leonard Diaz worked at the Phoenix, Arizona, Police Department in 2002. On May 29, 2002, he was dispatched on a domestic violence call. He contacted the victim, Myra Galaviz, who was suffering from head and lower back pain. Upon investigation of the matter, Navarette was arrested on domestic violence and assault charges.

***Defense case***

Navarette did not testify or otherwise present a defense.

## *DISCUSSION*

### I.    *Admission of evidence of Navarette's prior domestic violence arrest*

Navarette contends the trial court's decision, under Evidence Code sections 352 and 1109, to admit evidence of his prior domestic violence arrest from 2002 was an abuse of discretion. We disagree.

### A.    *Background*

In a written motion in limine, the prosecution sought to introduce evidence regarding an incident during which Navarette assaulted his live-in girlfriend at the time, Myra Galaviz, in Phoenix, Arizona, in 2002.[3] In the incident, Navarette and Galaviz were arguing outside their apartment. Navarette shouted profanities at Galaviz, grabbed her hair, pulled her over to a side door and pushed her inside the apartment. He was subsequently arrested.

The court held an Evidence Code section 402 hearing on the issue. The prosecution presented testimony regarding the incident from Officer Diaz, the arresting officer. Officer Diaz testified that he talked to Galaviz on May 29, 2002, and that she complained of pain in her neck and lower back. While Diaz was at the apartment, Navarette was the subject of a traffic stop and Diaz was able to contact him. Navarette

---

[3]The motion mistakenly refers to the ex-girlfriend as "Maria G."

waived his *Miranda* rights and told Diaz and his partner that he got into an argument with Galaviz, with whom he had been living for about six months, and had pushed her and grabbed her by the hair. Diaz arrested Navarette for assaulting his girlfriend.

Defense counsel objected to the testimony under Evidence Code section 352 because the incident occurred 12 years ago and "adds very little to these proceedings" for purposes of Evidence Code section 1101. The court ruled that the evidence was inadmissible under Evidence Code section 1101 but could come in under Evidence Code section 1109. The court noted the evidence would be limited because it would be restricted to Officer Diaz's personal observations. The court concluded the evidence was "relevant [and] in the interest of justice."

Officer Diaz testified before the jury that he worked at the Phoenix Police Department in Arizona in 2002. On May 29, 2002, he was dispatched on a domestic violence call. He contacted the victim, Myra Galaviz, who complained of head and lower back pain. Myra Galaviz was Navarette's girlfriend. As part of his investigation, Diaz contacted Navarette and interrogated him, leading to the latter's arrest on domestic violence and assault charges.

### B.    Analysis

Under Evidence Code section 1109, evidence of a defendant's other acts of domestic violence is admissible for the purpose of showing a propensity to commit such crimes. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232.) Evidence that is admissible pursuant to section 1109 is nonetheless subject to Evidence Code section 352, which provides: "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The trial court exercises its sound discretion in admitting or excluding evidence under Evidence Code sections 1109 and 352, and we review its decision for abuse of discretion. (Evid. Code, §§ 352, 1109; see also *People v.*

*Johnson* (2010) 185 Cal.App.4th 520, 531 (*Johnson*).) A court abuses its discretion if it acts "in an arbitrary, capricious, or patently absurd manner." (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

Evidence Code section 1109 restricts the admission of acts of domestic violence that are more than 10 years old: "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." (Evid. Code, § 1109, subd. (e).) In evaluating whether a remote prior act is admissible under the "interest of justice" exception of Evidence Code section 1109, subdivision (e), the court applies "a more stringent standard of admissibility" than is encompassed by Evidence Code section 352. As the *Johnson* court explained, "some greater justification for admissibility is necessary under subdivision (e) than under section 352. Balancing under section 352 is required even under subdivision (a) [of Evidence Code section 1109], where the presumption runs in favor of admission. By including a specific 'interest of justice' requirement under subdivision (e), the Legislature must have intended to require a more rigorous standard of admissibility for remote priors." (*Johnson*, *supra*, 185 Cal.App.4th at p. 539.) *Johnson* determined that, in contrast to Evidence Code section 1109, subdivision (a), which sets up a presumption *in favor of* admissibility, subject to balancing the probative value of the evidence at issue against its potential for prejudice under Evidence Code section 352, Evidence Code section 1109, subdivision (e), establishes a presumption *against* admissibility subject to the balancing test encompassed by Evidence Code section 352. (*Johnson, supra,* at p. 539.) Thus, evidence is admissible under Evidence Code sections 1109, subdivision (e), and 352 if its probative value weighs more heavily on the same scale that is used to evaluate the admissibility of evidence under Evidence Code sections 1109, subdivision (a), and 352. (*Johnson, supra,* at p. 539.)

The instant charges against Navarette encompassed a physical assault by Navarette on a former girlfriend (with whom he had a child), after an argument. The evidence of

11.

the prior act of domestic violence also concerned a physical assault by Navarette on a girlfriend (who was pregnant with his child at the time), after an argument. (*Johnson, supra,* 185 Cal.App.4th at p. 531 ["'"'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense."'"'].) Moreover, as the prosecutor pointed out, during most of the period between the assault on Galaviz and the assault on Alvarado, Navarette was incarcerated in Mexico. (*Id.* at p. 539 [remote conduct's probative value higher when defendant has not led blameless life in interim].) Also, Officer Diaz's testimony concerning the prior act was succinct and brief and did not dwell on or amplify inflammatory details. (*Id.* at p. 534 ["'[p]ainting a person faithfully is not, of itself, unfair'"].) In any event, the circumstances of the instant incident in which Navarette deployed a firearm were far more egregious in comparison. (*Id.* at p. 534, fn. 11 ["Courts are primarily concerned where the past bad act was 'more inflammatory' than the offense for which the defendant is on trial."].) Furthermore, in light of the discrete nature of the evidence, there was no danger of confusion of issues or of an inordinate consumption of time in its presentation. Under these circumstances, admission of the evidence of the prior incident of domestic violence in Arizona was not an abuse of discretion.

Finally, even if we were to assume the trial court erred in admitting evidence of the prior domestic violence incident, the error was harmless. The evidence against Navarette was overwhelming. Although at trial Alvarado recanted the statements she had given law enforcement during the investigation of the incident, those statements were presented to the jury through the testimony of Deputy Cruz and Investigator Rodriguez. Abraham and Maricruz Chavez also testified about the confrontation between Navarette and Alvarado as well as the gunshot they heard at the time. Further, there was extensive evidence regarding Navarette's attempts to intimidate Alvarado so as to influence her trial testimony, including letters and jail phone calls, as well as his references during in-person visits to having access to hitmen in Mexico. In light of this record, it is not

12.

reasonably probable the result of the proceeding would have been more favorable to Navarette had the evidence of the Arizona incident been excluded. (*People v. Watson* (1956) 46 Cal.2d 818; see also *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1145 [any error in admitting uncharged act of domestic violence was harmless under *Watson* standard]; *People v. Harris* (1998) 60 Cal.App.4th 727, 741 [applying *Watson* standard to sexual offense propensity evidence admitted under Evid. Code, § 1108].)

## II. *Application of section 654 to the sentences on counts 4 and 5*

Navarette argues his sentence on count 5 should have been stayed pursuant to section 654 because it was based on the same conduct as count 4. The People concede the point. We agree.

Navarette was charged in count 4 with attempting, "[o]n or about August 6, 2013," to dissuade a witness from testifying (§ 136.1, subd. (a)(2)) and in count 5 with dissuading, "[o]n or about August 6, 2013," a witness from prosecuting a crime.

During closing argument, the prosecutor argued that count 4 was premised on a call that Navarette made from jail to Alvarado on August 6, 2013, in which he urged her not to testify against him. The prosecutor stated that this attempt to influence Alvarado's testimony also related to count 5, which he described as "a variation [on] … count four" because "that all stems … from the August 6, 2013 jail call."

At sentencing, defense counsel requested that count 5 be stayed pursuant to section 654. The prosecutor responded: "Counts four and five we received evidence that the defendant told the victim not to go to court, not to cooperate with [the] police investigation, not just once, but several times." The court declined to apply section 654 to count 5 based on its recollection that, "in addition to attempting to dissuade her by the calls, there was also the threat to her family."

Section 654, subdivision (a), provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or

13.

omission be punished under more than one provision." The People concede that the charging document and prosecutor's closing argument both identified Navarette's conduct in the August 6, 2013, jail call as the act underlying counts 4 and 5. Accordingly, as both parties agree, we find the trial court was required to stay the sentence on count 5 pursuant to section 654. (See *People v. Siko* (1988) 45 Cal.3d 820, 823-826.)

### III. *Sufficiency of the evidence as to Navarette's prior murder conviction in Sinaloa, Mexico*

Navarette contends the evidence was insufficient to support the trial court's true findings on the prior strike and serious felony allegations in the information. We agree. Accordingly, we strike the trial court's finding and remand the matter for resentencing consistent with this opinion.

#### A. *Background*

The first-amended information alleged, as to counts 3, 4, and 5, that Navarette had suffered a prior serious felony within the meaning of section 667, subdivision (a)(1). The information further alleged, with respect to the same counts, that Navarette had suffered a "prior conviction of a serious or violent felony" or "strike" under the three strikes law, sections 1170.12, subdivisions (a)-(d), and 667, subdivisions (b)-(i).[4] (See *People v. Vargas* (2014) 59 Cal.4th 635, 639, 642.) The information specified, with respect to these enhancement allegations, that Navarette's prior serious felony conviction was a murder conviction in the State of Sinaloa, Mexico, dated February 28, 2006, "which includes all the elements of California Penal Code section 187 .…"

After a bifurcated hearing during which the prosecutor presented records relating to the underlying proceeding, the court summarily determined, "Court is satisfied that the

---

[4]The trial court interpreted the prior strike and serious felony allegations to apply to counts 6 and 7 as well, which apparently were orally added as charges after trial had commenced.

14.

defendant Jesus Navarette in this trial is the person in the document presented, that he has suffered a conviction for the crime of murder, which is the equivalent of murder in this country. It, therefore, finds true the special allegation pursuant to [sections 1170.12(a)] through [(d)] and 667(b) through (i)" as to all counts of conviction.[5] Though the court did not expressly find the special allegation of a prior serious felony pursuant to section 667, subdivision (a)(1), to be true, the finding is reflected in the court's minute order from the proceedings.

Defense counsel then noted his objections for the record, including his objection that the elements of the homicide offense in Sinaloa, Mexico, did not match the elements of murder in California and that it would violate Navarette's constitutional rights were the court to go behind the elements of the respective offenses and "delve into the actual facts" of the Mexican proceeding to make its findings. Without addressing the latter argument, the court summarily rejected Navarette's objection that the elements of the respective offenses in Mexico and California did not match, with the Mexican offense being broader and missing certain elements, including malice aforethought, present in California's statutory definition of murder. (See § 187.) With reference to the appellate opinion from the Mexican case, the court stated it appeared the appellate court had determined the homicide was "intentional," which "substantiates the murder and the intentional element." The court also noted that a claim of self-defense was adjudicated in

_____

[5]Under California law, a defendant has a right to a jury trial on the truth of a prior conviction, i.e., whether he in fact suffered the prior conviction alleged as the basis for a sentence enhancement. The question whether the prior conviction qualifies as a "serious felony" for a sentence enhancement under section 667, subdivision (a)(1), and as a "strike" for a sentence enhancement under the three strikes law, is, however, reserved for the sentencing judge to resolve. (See § 1025; *People v. Epps* (2001) 25 Cal.4th 19, 23.) Here, Navarette waived his right to have a jury determine the truth of the prior conviction. He did not have, in the first instance, an option for jury trial on the issue of whether the prior conviction qualified as a serious felony or as a strike for purposes of the enhancements.

15.

the Mexican proceeding but it did not address whether the absence of a justification such as self-defense was an element of the prior offense.

### B.    Analysis

As our Supreme Court has explained, "[f]or criminal sentencing purposes in this state, the term 'serious felony' is a term of art.  Severe consequences can follow if a criminal offender, presently convicted of a felony, is found to have suffered a prior conviction for a serious felony."  (*People v. Warner* (2006) 39 Cal.4th 548, 552 (*Warner*).)  If the present conviction is also for a serious felony, "the offender is subject to a five-year enhancement term to be served consecutively to the regular sentence."[6] (*Ibid.*)  Moreover, a prior conviction for a serious felony also "renders the offender subject to the more severe sentencing provisions of the three strikes law."  (*Ibid.*; also see *People v. Delgado* (2008) 43 Cal.4th 1059, 1065.)

Whether a crime qualifies as a serious felony is determined by section 1192.7, subdivision (c), which lists and describes dozens of qualifying crimes, including murder, robbery, kidnapping, and forcible sexual assaults.  (*Warner*, *supra*, 39 Cal.4th at p. 552.) "Under our sentencing laws, foreign convictions may qualify as serious felonies, with all the attendant consequences for sentencing, if they satisfy certain conditions.  For a prior felony conviction from another jurisdiction to support a serious-felony sentence enhancement, the out-of-state crime must 'include[] all of the elements of any serious felony' in California.  (§ 667, subd. (a)(1).)  For an out-of-state conviction to render a criminal offender eligible for sentencing under the three strikes law (§§ 667, subds. (b)-(i), 1170.12), the foreign crime (1) must be such that, 'if committed in California, [it would be] punishable by imprisonment in the state prison' (§§ 667, subd. (d)(2), 1170.12, subd. (b)(2)), and (2) must 'include[] all of the elements of the particular felony as

---

[6]Navarette does not dispute that he was convicted of a serious felony in the current proceeding.  (§ 1192.7, subd. (c)(19).)

defined in' section 1192.7(c) (§§ 667, subd. (d)(2), 1170.12, subd. (b)(2)).ʺ[7] (*Id*. at pp. 552-553.)

"The People must prove all elements of an alleged sentence enhancement beyond a reasonable doubt. [Citation.]" (*People v. Miles* (2008) 43 Cal.4th 1074, 1082.) "On review, we examine the record in the light most favorable to the judgment to ascertain whether it is supported by substantial evidence. In other words, we determine whether a rational trier of fact could have found that the prosecution sustained its burden of proving the elements of the sentence enhancement beyond a reasonable doubt. [Citations.]" (*People v. Delgado*, *supra*, 43 Cal.4th at p. 1067; *People v. Saez* (2015) 237 Cal.App.4th 1177, 1189.) Here our inquiry focuses on whether substantial evidence supports the trial court's determination that Navarette's prior Mexican conviction constituted, beyond a reasonable doubt, a serious felony for purposes of section 667, subdivision (a)(1), and the three strikes law. (See *Delgado*, *supra*, at p. 1070.)

The first-amended information specified, with respect to the allegation that Navarette had suffered a prior "serious felony" for purposes of section 667, subdivision (a)(1), and the three strikes law, that this Mexican prior conviction was a "serious felony" that "includes all the elements of California Penal Code section 187," i.e., murder. Murder qualifies as a "serious felony" for purposes of recidivist enhancements under both section 667, subdivision (a)(1), and the three strikes law. (See § 1192.7.)

Here, both parties agree on the elements of the Mexican homicide prior. As described in the People's brief, "the elements of [the Mexican] crime" were: "a). - Illegal deprivation of the life of another; b). - that is due to an external cause, imputable to a man as a result of his intentional or imprudent act." The parties also agree that Navarette had

_____

[7]A criminal offender may also be sentenced under the three strikes law if he or she has a prior conviction for a "violent felony" as defined in section 667.5, subdivision (c). (§§ 667, subd. (d)(2), 1170.12, subd. (b)(2).)

raised a colorable claim of self-defense that was duly adjudicated in the Mexican proceeding.  In addition, Navarette contends, and the People do not dispute, that Navarette bore the burden of proving that he acted in self-defense.  Navarette argues the elements of his Mexican homicide offense do not include all the elements of murder under California law as alleged in the information and summarily found by the trial court.

Under California law, the elements of murder—that the prosecution, by definition, is required to prove beyond a reasonable doubt—are as follows:  (1) the defendant committed an act that caused the death of another person; (2) when the defendant acted, he had a state of mind called malice aforethought; and (3) he killed without lawful excuse or justification.  (See CALCRIM No. 520; *People v. Frye* (1992) 7 Cal.App.4th 1148, 1159 [California treats "the absence of excuse or justification, and hence the question of unlawfulness, as an element of an offense"]; also see § 187, subd. (a) ["Murder is the unlawful killing of a human being … with malice aforethought."]; *People v. Catlin* (2001) 26 Cal.4th 81, 139 ["The elements of a charge of murder are an unlawful killing with malice aforethought."].)  The element of malice aforethought, moreover, encompasses two alternative mental states, express malice and implied malice, which must be formed before the act that causes death is committed.  (CALCRIM No. 520.)  A defendant acted with express malice if he unlawfully intended to kill, and with implied malice if he (1) intentionally committed an act; (2) the natural and probable consequences of the act were dangerous to human life; (3) at the time he acted, he knew his act was dangerous to human life; and (4) he deliberately acted with conscious disregard for human life.  (*Ibid.*)

Navarette contends the Mexican offense does not include the element of malice aforethought or an element requiring the prosecution to prove that the killing was unlawful, i.e., that Navarette did not act in justifiable self-defense.  Focusing on the latter point, the People do not dispute that Navarette bore the burden to prove he acted in self-defense and, as a consequence, the absence of justifiable self-defense was not an element

of the crime.[8]  Nonetheless, the People argue that the sentencing court could still properly have found, based on the facts of the Mexican proceedings and certain findings reflected in an appellate opinion from that case, that the prior homicide offense included all the elements of murder under California law.

For the reasons discussed below, we find the type of factfinding advocated by the People is foreclosed under both applicable state and federal case law, i.e., *People v. McGee* (2006) 38 Cal.4th 682 (*McGee*), as well as *Descamps v. United States* (2013) 133 S.Ct. 2276 (*Descamps*), on *Apprendi* grounds.  (*Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*).)  Accordingly, we conclude the trial court's determination that the Mexican offense included all the elements of murder under California law is not supported by substantial evidence.  In turn, we find the People have failed to sustain their burden to prove all the elements of the sentencing enhancements alleged pursuant to section 667, subdivision (a)(1), and the three strikes law.  Consequently, we strike the trial court's true findings on the enhancement allegations, reverse the judgment, and remand the matter for resentencing consistent with this opinion.

### 1.  State law limitations on a sentencing court's power to adjudicate sentence enhancements

With respect to findings regarding whether a prior conviction qualifies as a "serious felony" for purposes of sentencing enhancements, California law mandates that "it is the court, rather than the jury, that is entrusted with the responsibility of undertaking this inquiry and making this determination."[9]  (*McGee, supra,* 38 Cal.4th at p. 685.)

---

[8]Although the elements of the Mexican offense refer to an "[i]llegal deprivation of the life of another," the People do not argue that this element incorporates a requirement that the prosecution prove that Navarette acted without a justification such as self-defense, as required under the California definition of murder, and the meaning of the term "illegal" in this context is inconclusive.

[9]A defendant has the right to a jury trial only on the truth of the prior conviction. (See §§ 1025, 1158; *People v. Wiley* (1995) 9 Cal.4th 580, 589; *People v. Epps, supra,* 25

19.

"California law specifies that in making this determination, the inquiry is a limited one and must be based upon the record of the prior criminal proceeding, with a focus on the elements of the offense of which the defendant was convicted. If the enumeration of the elements of the offense does not resolve the issue, an examination of the record of the earlier criminal proceeding is required in order to ascertain whether that record reveals whether the conviction realistically may have been based on conduct that would not constitute a serious felony under California law." (*Id.* at p. 706.) In other words, when the elements of the prior conviction are broader than the elements of the corresponding serious felony, such that it is at least theoretically possible that the prior conviction involved conduct that would not constitute a serious felony under California law, the sentencing court may look to the record of the prior conviction to determine whether the prior conviction did in fact involve such conduct.

However, in doing so, the court is limited to examining the record to determine "the nature or basis" of the prior offense and cannot engage in resolving factual disputes concerning a defendant's conduct. (*McGee*, *supra*, 38 Cal.4th at p. 691; §§ 667, subd. (d)(2), 1170.12, subd. (b)(2).) "The need for such an inquiry does not contemplate that the court will make an independent determination regarding a disputed issue of fact relating to the defendant's prior conduct [citation], but instead that the court simply will examine the record of the prior proceeding to determine whether that record is sufficient to demonstrate that *the conviction* is of the type that subjects the defendant to increased punishment under California law. This is an inquiry that is quite different from the resolution of the issues submitted to a jury, and is one more typically and appropriately undertaken by a court." (*McGee*, *supra*, at p. 706.)

---

Cal.4th at p. 23.) Here, Navarette waived his right to jury trial on whether he suffered the prior underlying the enhancement allegations.

In sum, "[t]o qualify as a serious felony, a conviction from another jurisdiction must involve conduct that would qualify as a serious felony in California." (*People v. Avery* (2002) 27 Cal.4th 49, 53.) Moreover, to the extent this inquiry transcends an elements-based analysis and spills over into an examination of the record of the prior conviction, *McGee* prohibits the court from resolving disputed issues of fact in determining whether the prior conviction "realistically may have been based on conduct that would not constitute a serious felony under California law." (*McGee*, *supra*, 38 Cal.4th at p. 706.)

Here, a comparison of the elements of Navarette's Mexican offense with that of the elements of murder under California law readily reveals that the elements of the Mexican offense are broader than the elements of murder under California law, such that the former offense can theoretically encompass conduct that would not constitute a serious felony under California law. The Mexican offense contains the alternative elements that a defendant deprived another of his life by committing an intentional or imprudent act. The elements of an "intentional" or "imprudent" act, respectively, are not equivalent facially to either the element of express malice aforethought, which requires an unlawful intent to kill, or the element of implied malice aforethought, which requires that a defendant have deliberately acted with conscious disregard for human life. Furthermore, the Mexican offense does not contain an element requiring the prosecution to prove that there was no justification, such as the need for self-defense, for a defendant's actions. Although the elements of the Mexican offense reflect a requirement of an "[i]llegal deprivation of the life of another," it is clear, nonetheless, that "[i]llegal deprivation" does not require the prosecution to prove the absence of justification, including the need for self-defense, as there is no dispute that, in the Mexican proceedings, the burden to prove the applicability of self-defense fell on Navarette.

The People nonetheless urge that the trial court's finding that the Mexican offense was a serious felony under California law should be upheld because the record of the

21.

Mexican conviction reflects an *appellate finding* that unequivocally disposes of Navarette's self-defense claim. Even if we assumed the appellate court made such a finding, there is no dispute the appellate court's entire analysis was conducted through a lens placing the burden of proof regarding the applicability of self-defense on Navarette, as that count found Navarette had "not proven" his self-defense claim. It is axiomatic that finding Navarette has "not proven" the applicability of self-defense does not translate to a finding that the prosecution proved the absence of justification, i.e., the need for self-defense, as an element of the offense. Indeed, this point is crystalized by reference to the final findings of the lower court in the Mexican proceedings, which concluded:

> "[T]he fact that the accused JESUS ALFREDO NAVARETTE [FERNANDEZ], alias EL NENE, alleges that he repelled the aggression from the deceased MARCIAL MARTINEZ JIMENEZ, because it was the latter who provoked him, and he was imperiously forced to save his life, meaning that he acted in self defense, this cannot be corroborated in the file, even [if] it has been demonstrated that the deceased MARCIAL MARTINEZ JIMENEZ, had a firearm, the one he actually used several times, however it is unknown if it was him who fired first or after to try to defend his life, since there were no witnesses that saw the events and therefore there is only one version which is the one of the defendant, in the sense that he was repe[l]ling the aggressing from the today deceased, because the several pieces of evidence such as the expert forensic reports in ballistics and the sodium radiozonate analysis, as well as the toxicology studies practiced on the accused as well as the deceased, as well as the weapons that they both carried, determined without questions that truly there were sufficient elements identified consistent with the deflagration of gun powder finding stains on the usual zones on the one who in life answered to the name of MARCIAL MARTINEZ JIMENEZ, as well as the ingestion of alcoholic beverages and consumption of cocaine, in addition to [the witnesses] LIDIA ROMERO SAUCEDA, ALMA ROSA SERNA SAUCED[O] AND MARIA SONIA SANDOVAL FERNANDEZ, confirmed in their statements that truly on the day of the commission of the crime, … they saw that he was carrying a firearm on his right hand, the same that was removed before the authorities arrived to the place of the event, fact that is somehow corroborated by the accused that, MARCIAL MARTINEZ JIMENEZ, had a firearm and []he actually used it, as this is confirmed by the studies practiced by the official experts, *however it is not proved beyond doubt that it was MARCIAL MARTINEZ JIMINEZ who first*

22.

*fired the weapon that he had and as a result of it JESUS ALFREDO NAVARETTE FERNANDEZ, had to repel the aggression and also fired shots against the physical integrity of the today deceased and [based on the injuries sustained] he lost his life*; but even with the proof offered by the defense counsel, consisting on the expansion of the statements issued by the witnesses … which were admitted during a judicial proceeding in this Tribunal pursuant to what is required by Law, *it was not demonstrated that the fact that the accused alleges, in the sense that he deprived MARCIAL MARTINEZ JIMENEZ of his life, in self defense, that it was the latter the one who first fired his gun caliber 38 super*; however, this reviewer is not convinced that the accused had really acted to defend his life, repelling an actual violent aggression, without the right to do so, resulting in an imminent danger (self defense as prescribed by article 26 faction IV of the Penal Code).[10]  There is no doubt that the victim in this case also fired his weapon at the accused with caliber 38 pistol and which was secured during the preliminary investigation, and that the deceased carried at the time of the events, what is widely proved, because the accused had a rifle what is called goat's horn, an[d] which is actually a weapon more powerful than the one that the today deceased carried, therefore he had full knowledge that when he fired the rifle he would deprive MARCIAL MARTINEZ JIMENEZ of his life no matter the circumstances.

"Being as things are, *the affirmative defense of self defense, is not proved in this case*; yet there is evidence that the accused deprived the victim of his life after both parties verbally aggravated each other, that is why we cannot use the dispute that the defense alleges in his conclusion about guilt, and that may constitute an extenuating circumstance in the punishment .…"  (Italics added.)

Thus, the record of the Mexican proceedings for present purposes reflects a factual dispute over the applicability of self-defense as a justification for the killing as Navarette bore the burden of proof on the question in the earlier case.  In the Mexican proceeding, Navarette provided a statement to the effect that he had acted in self-defense, specifically that decedent, Marcial Martinez Jimenez, had shot him first, and Navarette returned fire

---

**10**This reference by the Sinaloa court indicates that the law applicable to self-defense is codified in article 26 of the Penal Code of that state.  However, the record does not contain the specific statutory language, nor have the parties included it in their briefs.  In any event, it is clear that, in adjudicating Navarette's homicide case, the Sinaloa courts placed on Navarette the burden of proving his self-defense claim.

23.

because he was in imminent danger of being killed.[11]  Other witnesses testified that Jimenez had a pistol in his right hand when his dead body was found.  There was uncontroverted evidence, based on gunpowder residue on Jimenez's hands and ballistics analysis, that Jimenez had actually fired shots from his weapon.  Moreover, bullets and casings from both Jimenez's and Navarette's weapons were found around the body.  Finally, one witness stated he heard the gunshots related to the incident, and gunshots from a smaller weapon such as the one carried by Jimenez preceded louder gunshots that

---

[11]In the Mexican proceeding, Navarette provided a statement dated December 12, 2002, as follows:

> "'That it is my wish to testify with regard to these events, the ones that have been read aloud, and I must mention that what is stated in this last informative report on Sunday 03 of November of this year, it was around 09:00 hours in the morning, and I bought a cow to slaughter and barbecue it at my aunt ROSARIO FERNANDEZ VALENZUELA'S home, and that about ten or eleven we started drinking beer and we were all relatives and it was around that time that we started to grill the meat and at around seven in the evening of that day, the deceased MARCIAL MARTINEZ JIMENEZ, who I used to call EL MARCIAL, this one arrived by himself to my uncle's home where we had drank and ate and he started talking and it was almost eight at night we came to where the truck was, it was a FORD make truck, white, double traction and we were drinking over there and talking and around nine thirty in the evening we were listening to some music and MARCIAL pulled a 38 caliber gun, super, and he yelled I HAVE ONE RIGHT HERE THAT DOES [NOT] MISS, and in that place he fired four shots in front of my feet and what I did is go get my rifle which is a goat-horn NORINCO brand which I had close by the truck, and in that place I fired four shots by his feet to put him on his place because I did not want to have any problems, and I saw that MARCIAL was being stubborn and then I closed the truck and took my rifle on my shoulder ready, and started walking to my uncle AUGUSTIN FERNANDEZ'S home … and when it was about five meters to arrive to his house when MARCIAL reached me and told me ARE YOU FLEEING YOU CHICKEN SHIT [and] when I turned MARCIAL fired three shots at me, and they pass by zooming by my head, and he fired from about two to three meters, and I grabbed my rifle and fired about six shots walking toward him firing, because I was afraid he would kill me, and then I saw MARCIAL falling and I saw that he had the gun on his right hand …."

24.

sounded like shots from a rifle. On the other hand, an appellate decision upholding the lower court's ruling noted that the trajectories of the bullets that struck Jimenez suggested the latter was not facing Navarette as implied in Navarette's account and, moreover, that ballistics evidence and the type of wounds on Jimenez's body indicated that a third weapon had been used during the incident. The sentencing court in the instant proceedings could only resolve the complex factual dispute regarding Navarette's claim of self-defense by weighing the evidence and discrediting his statements, which type of factfinding is prohibited under *McGee*.

Moreover, applying the test outlined in *McGee*, the record of the Mexican proceedings in any event demonstrates that Navarette's Mexican conviction "realistically may have been based on conduct that would not constitute a serious felony under California law." (*McGee, supra,* 39 Cal.4th at p. 706.) Specifically, Jimenez was found holding a firearm in his right hand; gun powder residue on both his hands reflected that he had fired a weapon; bullets and casings from his weapon were found in the vicinity of the body; he had been drinking and had cocaine in his system that evening; and several witnesses stated he was an aggressive and offensive person. Next, Navarette testified that he shot Jimenez after the latter fired three shots that "zoom[ed] by" Navarette's head, narrowly missing him. Finally, the Mexican lower court concluded that Navarette had failed to prove the applicability of self-defense because it was unclear whether Jimenez or Navarette had fired first. Given this scenario, Navarette's self-defense claim realistically may have prevailed under California law. (See CALCRIM No. 505.) It follows that the Mexican conviction "realistically may have been based on conduct that would not constitute a serious felony under California law." (*People v. Avery, supra,* 27 Cal.4th at p. 53 ["To qualify as a serious felony, a conviction from another jurisdiction must involve conduct that would qualify as a serious felony in California."]; see also §§ 667, subd. (d)(2), 1170.12, subd. (b)(2).) Thus, under *McGee*, the evidence is

25.

insufficient to support the trial court's finding that the prior conviction constituted a serious felony under California law.[12]

### 2. Federal law limitations on a sentencing court's power to adjudicate sentencing enhancements

"The Sixth Amendment right to trial by jury and the Fourteenth Amendment right to due process also limit a judge's role in sentencing." (*People v. Wilson* (2013) 219 Cal.App.4th 500, 513, citing *Apprendi, supra,* 530 U.S. at p. 483, fn. 10.) "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[13] (*Apprendi, supra,* at p. 490; also see *Almendarez-Torres v. United States* (1998) 523 U.S. 224.) Here, the People urge us to uphold the trial court's enhancement findings based on the record of the Mexican proceeding. The issue is whether *Apprendi's* exception for "the fact of a prior conviction" permits the sentencing court to refer to the record of the prior case to ascertain necessary facts beyond those admitted by a defendant in the later case or implied by the elements of the prior offense.[14] (See *Shepard v. United States* (2005) 544 U.S. 13, 14 ["the Sixth and

---

[12]Since we have resolved this question on the basis of a missing element requiring the prosecution to show that Navarette acted without justifiable self-defense, we need not analyze the related issue of the lack of a malice-aforethought element in the Mexican offense. We note, further, that voluntary manslaughter is also a "serious felony" under California law. (See section 1192.7, subd. (c)(1).) However, voluntary manslaughter also includes an element requiring the prosecution to prove that a defendant acted unlawfully, i.e., without a justification such as self-defense. (See § 192; CALCRIM No. 500.)

[13]Under California's current triad-based determinate sentencing scheme, the upper term is the relevant statutory maximum. (*People v. Jones* (2009) 178 Cal.App.4th 853, 866.)

[14]*Apprendi's* exception for prior convictions is based in part on the fact that "unlike virtually any other consideration used to enlarge the possible penalty for an offense, … a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees." (*Jones v. U.S.*

Fourteenth Amendments guarantee a jury's standing between a defendant and the power of the State, and they guarantee a jury's finding of any disputed fact essential to increase a potential sentence's ceiling."]

When our Supreme Court decided *McGee*, the United States Supreme Court had not yet definitively delineated the limits under the Sixth Amendment of judicial factfinding related to prior convictions alleged as the basis for sentence enhancements. The *McGee* court "recognize[d] the possibility that the United States Supreme Court, in future decisions, may extend the *Apprendi* rule" to limit judicial factfinding related to priors. But the court concluded, "we are reluctant to assume, in advance of such a decision by the high court, that the federal constitutional right to a jury trial will be interpreted to apply" to a sentencing judge's examination of the record of a prior conviction for sentencing purposes. (*McGee*, *supra*, 38 Cal.4th at p. 709.)

The United States Supreme Court has since revisited the issue in *Descamps v. United States*, *supra*, 133 S.Ct. 2276, which extended *Apprendi* to the determination of qualifying priors under the federal Armed Career Criminal Act of 1984 (ACCA), a priors-based sentence enhancement statute analogous to California's three strikes law. *Descamps* explained that, under the Sixth Amendment, this inquiry must strictly conform to the categorical approach and cannot encompass further factfinding beyond the elements of the prior offense. *Descamps* clarified, "The [ACCA], [citations], increases

_____

(1999) 526 U.S. 227, 249.) "[T]he certainty that procedural safeguards [are] attached to any 'fact' of [a] prior conviction … mitigate[s] the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a 'fact' increasing punishment beyond the maximum of the statutory range." (*Apprendi*, *supra*, 530 U.S. at p. 488.) Although California law provides that the truth of a prior conviction be determined by a jury (see § 1025), the instant matter encompasses the added wrinkle that the prior conviction at issue is from a foreign country with a different legal system. For purposes of this analysis, we have assumed Navarette's prior conviction comported with the due process standards that are presumed to apply to convictions obtained in this country. This assumption also applied to our preceding analysis under state law regarding the propriety of the trial court's true findings on the enhancement allegations.

the sentences of certain federal defendants who have three prior convictions 'for a violent felony,' including 'burglary, arson, or extortion.' To determine whether a past conviction is for one of those crimes, courts use what has become known as the 'categorical approach': They compare the elements of the statute forming the basis of the defendant's conviction with the elements of the 'generic' crime—i.e., the offense as commonly understood. The prior conviction qualifies as an ACCA predicate only if the statute's elements are the same as, or narrower than, those of the generic offense." (*Descamps*, *supra*, at p. 2281.)

Under the ACCA, Descamps faced an enhanced sentence based on a prior California conviction for burglary. In the prior proceeding, Descamps had pleaded guilty to a California burglary offense which provided that "[e]very person who enters [certain locations] with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459; *Descamps*, *supra*, 133 S.Ct. at p. 2282.) The generic offense under the ACCA, however, required an element of "unlawful or unprivileged entry" akin to breaking and entering. (*Shepard v. United States*, *supra*, 544 U.S. at pp. 16-17.) Although the California statute was broader than the generic definition of burglary in the ACCA, the district court determined the defendant's prior California conviction matched the elements of the generic offense. The district court relied on the transcript of Descamps's plea colloquy, during which the prosecutor had stated, to no objection, that Descamps's crime involved the breaking and entering of a grocery store. The court then applied the sentence enhancement, which more than doubled Descamps's sentence. (*Descamps*, *supra*, at p. 2282.)

The high court rejected the district court's factfinding as a violation of the Sixth Amendment under *Apprendi*. Initially applying a statutory interpretation analysis specific to the ACCA, the court next addressed the "Sixth Amendment underpinnings" of the analysis. The court held that a sentencing court's factfinding "would (at the least) raise serious Sixth Amendment concerns if it went beyond merely identifying a prior

28.

conviction." (*Descamps*, *supra*, 133 S.Ct. at p. 2288.)  The court further explained that "[t]hose concerns … counsel *against* allowing a sentencing court to 'make a disputed' determination 'about what the defendant and state judge must have understood as the factual basis of the prior plea,' or what the jury in a prior trial must have accepted as the theory of the crime.  [Citations.]  Hence our *insistence* on the categorical approach." (*Ibid.*, italics added.)  *Descamps* clarified that, by contrast, an inquiry in which the sentencing "court is merely asking whether a particular set of facts leading to a conviction conforms to a generic ACCA offense" is precisely "what we have expressly and repeatedly forbidden."  (*Id.* at p. 2291 [emphasizing that "fact pattern is [not] an 'implied' statutory definition" to be discerned by sentencing judge].)

Ultimately, *Descamps* makes clear that the Sixth Amendment principles laid out in *Apprendi* require strict adherence to the categorical approach and foreclose any factfinding by the sentencing court beyond the facts necessarily implied by the elements of the prior offense.[15]  (*Descamps*, *supra*, 133 S.Ct. at p. 2286 ["We know Descamps'

---

[15]*Descamps* also emphasized the limited scope of the "modified categorical approach," which is employed when a strict categorical approach is not possible.  Under the modified categorical approach, courts may consult a limited range of approved record-based documents (i.e., charging documents, jury instructions, plea agreement, and plea colloquy) to identify the elements of the prior offense when the statute lists them in the alternative.  But *Descamps* cautioned that, "[o]ur decisions authorize review of the plea colloquy or other approved extra-statutory documents only when a statute defines burglary not (as here) overbroadly, but instead alternatively, with one statutory phrase corresponding to the generic crime and another not.  In that circumstance, a court may look to the additional documents to determine which of the statutory offenses (generic or non-generic) formed the basis of defendant's conviction." (*Descamps, supra,* 133 S.Ct. at p. 2286.)  *Descamps* emphasized that, "[t]he modified [categorical] approach thus acts not as an exception, but instead as a tool.  It retains the categorical approach's central feature:  a focus on the elements, rather than the facts, of a crime.  And it preserves the categorical approach's basic method:  comparing those elements with the generic offense's.  All the modified approach adds is a mechanism for making that comparison when a statute lists multiple, alternative elements, and so effectively creates 'several different … crimes.' [Citation.]" (*Id.* at p. 2285.)

crime of conviction, and it does not correspond to the relevant generic offense. Under our prior decisions, the inquiry is over."].) An "elements-centric, 'formal categorical approach' … avoids the Sixth Amendment concerns that would arise from sentencing courts' making findings of fact that properly belong to juries." (*Id.* at p. 2287.) In sum, under *Descamps*, a sentencing court considering a prior conviction for sentencing purposes is limited to an elements-centric inquiry; it cannot substitute "a fact-based inquiry for an elements-based one." (*Id.* at p. 2293.) If there is a "mismatch in elements," the person convicted under the statute relevant to the prior proceeding "is never convicted of the generic crime." (*Id.* at p. 2292.)

Applying *Descamps* to the instant case, Navarette cannot stand convicted of murder in California because the Mexican homicide statute was missing an element requiring the prosecution to prove the absence of a justification such as self-defense. As in *Descamps*, "[t]he dispute here does not concern any list of alternative elements"; rather "it involves a simple discrepancy" between the Mexican offense and the crime of murder under California law. (*Descamps, supra,* 133 S.Ct. at p. 2285.) Under *Descamps*, the sentencing court could not, without violating the Sixth Amendment, "look beyond the elements to the evidence or, otherwise said, to explore whether a person convicted of one crime could also have been convicted of another, more serious offense." (*Id.* at p. 2292.) "[T]hat circumstance-specific review is just what the categorical approach precludes." (*Ibid.*)

Because the prosecution in the Sinaloa case did not have to prove the absence of a justification, i.e., self-defense, to obtain the homicide conviction that Navarette suffered, that prior conviction cannot constitute a serious felony in California. (See *Descamps, supra,* 133 S.Ct. at pp. 2285-2286 ["because California, to get a conviction, need not prove that Descamps broke and entered—a § 459 violation cannot serve as an ACCA predicate"].) As *Descamps* explained, the defendant's actual conduct "makes no difference," nor does it matter whether the defendant admitted, in the prior proceeding, to

the conduct at issue. (*Ibid.*) The trial court simply cannot use an examination of the record of the prior conviction as a "device employed … to evaluate the facts that the judge or jury found" or to make and "rely on its own finding about a non-elemental fact," thereby turning an "elements-based inquiry into an evidence-based one." (*Id*. at pp. 2287, 2289.) In the instant case, the court also would be prohibited from examining the record of the prior conviction to determine whether that offense involved malice aforethought, given that the elements of the Mexican offense do not, on their face, include any element that corresponds to malice aforethought (either express or implied) that is included in California's definition of murder. (See § 187.)

In addition to delineating the critical Sixth Amendment implications of a factual approach, the Supreme Court also addressed "the practical difficulties and potential unfairness" that arise when a sentencing court usurps a jury's factfinding function. (*Descamps*, *supra*, 133 S.Ct. at p. 2287.) The high court highlighted the "'daunting' difficulties and inequities" that confront courts attempting to glean information about the scope of a prior conviction with reference to old, confusing, and incomplete records of proceedings from a variety of jurisdictions, especially given that the parties to the prior proceeding were not necessarily focused on the implications of the conviction for recidivist enhancements alleged in subsequent cases (potentially in foreign jurisdictions). (*Id.* at p. 2289.) The court noted that, "[i]n case after case, sentencing courts … would have to expend resources examining (often aged) documents for evidence that a defendant admitted in a plea colloquy, or a prosecutor showed at trial, facts that, although unnecessary to the crime of conviction, satisfy an element of the relevant generic offense. The meaning of those documents will often be uncertain. And the statements of fact in them may be downright wrong." (*Ibid.*)

Such concerns are particularly relevant to this case where the prior conviction alleged in the information is from a foreign country, indeed a particular state within a foreign country with a very different legal and constitutional system than this one.

31.

Mexico adheres to the civil law system rather than a common law one, which would preclude the right to a jury trial in the first instance. The standard of proof applicable to criminal cases also may not coincide with the "reasonable doubt" standard that is mandated by the United States Constitution. (*In re Winship* (1970) 397 U.S. 358, 364; *Apprendi, supra,* 530 U.S. at pp. 477-478.)

Additionally, there can be no dispute that the translated record of the Mexican conviction is very difficult to decipher; the standards of proof and review, as well as the evidentiary rules applicable to the proceedings, are ambiguous and hard to ascertain; and records and documents that form a standard part of the record in criminal cases in this country, such as charging documents and jury instructions (that courts may properly rely on for purposes of the modified categorical approach as endorsed by *Descamps*), are conspicuously absent.

Our state Supreme Court has yet to consider the impact of *Descamps* on the California procedure for proof of prior convictions as outlined in *McGee*.[16] However, a number of Courts of Appeal have already addressed, at length, the intersection of *McGee* and *Descamps*. In *People v. Wilson, supra,* the Sixth District held that "federal law prohibits what *McGee* already proscribed: A court may not impose a sentence above the statutory maximum based on disputed facts about prior conduct not admitted by the defendant or implied by the elements of the offense." (*People v. Wilson*, *supra*, 219 Cal.App.4th at p. 516.) Similarly, in *People v. Saez, supra,* 237 Cal.App.4th at pages 1207 through 1208, the First District held, "this much is clear: when the elements of a prior conviction do not necessarily establish that it is a serious … felony under California law …, the court may not under the Sixth Amendment '"make a disputed"

---

[16]*McGee* declined to extend *Apprendi* to "the inquiry involved in examining the record of a prior conviction to determine whether that conviction constitutes a qualifying prior conviction for purposes of a recidivist sentencing statute," pending clear direction from the United States Supreme Court. (*McGee*, *supra*, 38 Cal.4th at p. 709.)

determination "about what the defendant and state judge must have understood as the factual basis of the prior plea," or what the jury in a prior trial must have accepted as the theory of the crime.'" *Saez* further noted that, "while *Descamps* did not explicitly overrule *McGee*, *Descamps's* discussion of the Sixth Amendment principles applicable when prior convictions are used to increase criminal sentences is clear and unavoidable and was adopted by eight of the nine justices on the high court." (*Id.* at p. 1207.)

Next, in *People v. Marin* (2015) 240 Cal.App.4th 1344, 1348, the Second District held that *Descamps* had effectively overruled *McGee*: "[U]nder *Descamps*, judicial factfinding authorized by [*McGee*], going beyond the elements of the crime to 'ascertain [if] that record reveals whether the conviction realistically may have been based on conduct that would not constitute a serious felony under California law' [citation], violates the Sixth Amendment right to a jury trial .…"[17]  (See *Marin*, *supra*, at p. 1348.) *People v. Denard* (2015) 242 Cal.App.4th 1012, 1033-1034, another case from the Second District, agreed with the conclusion in *Marin* that "'judicial factfinding beyond the elements of the offense, is incompatible with the United States Supreme Court's view of the Sixth Amendment right to a jury trial as articulated in *Descamps*.'"  Finally, *People v. McCaw* (2016) 1 Cal.App.5th 471, 484-485, held that a sentencing court's reliance on legally superfluous statements in a plea colloquy to supply a missing element in the statute that was the basis of the defendant's prior conviction, "runs afoul of several portions of the *Descamps* analysis," including by going beyond the statutory elements of the prior to determine the defendant's underlying conduct.

---

[17]*People v. Marin* further held that there is no Sixth Amendment violation "when, in determining whether a prior conviction qualifies to increase a defendant's punishment, the trial court considers '[approved] documents … i.e., indictment, jury instructions, plea colloquy, and plea agreement … to determine the statutory elements of the crime of which the defendant was convicted .…" (*People v. Marin, supra,* 240 Cal.App.4th at pp. 1348-1349.)

33.

Our holding today that, under *Descamps*, the trial court could not find that Navarette's Mexican conviction constituted a serious felony under California law is consistent with the aforementioned opinions of our sister Courts of Appeal. It is clear the trial court did not have the power to parse the record of the Mexican proceeding to evaluate the disputed facts related to Navarette's claim of self-defense in that matter. (See *People v. Wilson*, *supra*, 219 Cal.App.4th at p. 516 & *People v. Saez*, *supra*, 237 Cal.App.4th at pp. 1207-1208.) Indeed, given the unequivocal mismatch in the elements of the Mexican offense and those of murder in California, the trial court simply could not, consistent with the Sixth Amendment, go beyond the elements of the Mexican offense in determining whether the offense coincided with a serious felony in California. (See *People v. Marin*, *supra*, 240 Cal.App.4th at pp. 1348, 1363; *People v. Denard*, *supra*, 242 Cal.App.4th at pp. 1033-1034.)

In sum, the trial court's findings on the sentencing enhancements alleged in the information are not supported by substantial evidence.[18]

### *DISPOSITION*

The trial court's finding that Navarette's 2002 Mexican murder conviction was a serious felony and a strike under California law for sentencing purposes is stricken. The trial court is directed to stay Navarette's sentence on count 5, pursuant to section 654.

---

[18]Since we are remanding the matter for resentencing consistent with this opinion, we need not address Navarette's challenge, on different grounds, to the enhancements applied to his sentence.

The judgment is reversed, and the matter is remanded to the trial court for resentencing consistent with this opinion.

_____
Smith, J.

WE CONCUR:


_____
Detjen, Acting P.J.


_____
Peña, J.