Filed 3/10/25  P. v. Byrd CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B328625 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA153257-02) |
| v. | |
| TRYON DARNEL BYRD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Carol J. Najera, Judge.  Affirmed.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General for Plaintiff and Respondent.

The jury found Tryon Darnel Byrd guilty of two counts of premeditated murder, three counts of attempted premeditated murder, and conspiracy to commit first degree murder.  On appeal, Byrd argues that (1) the jury instruction on conspiracy to murder improperly lessened the prosecution's burden of proof; (2) there is insufficient evidence to support his convictions for murder and attempted murder; (3) the jury improperly imputed premeditation to him based on his cohort's mental state; and (4) the jury was improperly permitted to find him guilty of premeditated attempted murder without finding that he personally premeditated the crimes.

We affirm the trial court's judgment.

## FACTS

### A.    *Prior Uncharged Crimes*

Byrd and his cousin, Ramaje Brumfield, were members of the Grape Street Crips gang (Grape Street).  The Bounty Hunter Bloods gang (Bounty Hunters) was one of Grape Street's biggest rivals.

The prosecution presented cell tower evidence that in the weeks prior to the commission of the instant shootings, Byrd and Brumfield were in the area where the shootings of two Bounty Hunter members took place.

On October 1, 2020, Bounty Hunter member Calvin Williams was shot at an apartment complex on West 83rd Street.  Officers discovered multiple shell casings in the rear alleyway, some in the parking lot, and some against a block wall and at the rear of the complex.  Nine cartridge casings, four live rounds, and

three bullet fragments were recovered. The expended cartridge cases and live founds were determined to be nine-millimeter and .40-caliber Smith & Wesson.

On October 8, 2020, police responded to a call of shots fired on Chadron Avenue. Bounty Hunter member Dominic Thomas was found with a gunshot in his back, sitting in a black Inifiniti sedan. There were several bullet impacts on the vehicle. The Infiniti's windows had been shattered and there were bullets scattered around it. Nineteen cartridge casings and one bullet fragment were recovered. The expended cartridge cases were nine-millimeter and .40-caliber Smith & Wesson.

## B. *The Charged Murders and Attempted Murders (Counts 1-5)*

S.K. was a member of the Bounty Hunters. In August 2020, S.K. spoke on the phone and face-timed with Brumfield's sister frequently. S.K. never met with Brumfield's sister in person, but she invited him to meet her in different places. S.K. knew Brumfield was a member of Grape Street and insulted him over the phone during a video chat he had with Brumfield's sister. Brumfield told S.K. he had beaten up S.K.'s older brother, who was a Bounty Hunter member S.K. made a derogatory comment to Brumfield about a Grape Street member who had been killed. In gang culture, making a comment about a deceased gang member could provoke serious retaliation, including killing.

Sometime in September 2020, a person with the Instagram profile "thaatsexyybitcchh," started following S.K.'s Instagram account. A photo of a girl was associated with the

3

"thaatsexyybitcchh" profile. The name "unbothered" was also associated with the "thaatsexyybitcchh" profile in the bio. S.K. had not met or communicated with unbothered before unbothered began following his account.

On the night of October 15, 2020, S.K. was with four friends— Jamele Hill, Millyon Colquitt, D.J., and J.M. They had rented a Range Rover and were driving around. Hill was driving, Colquitt was in the front passenger seat, S.K. was in the back on the passenger side, J.M. was in the back on the driver's side, and D.J. was in the back seat in the middle.

S.K. posted on his Instagram stories that he and "plus four" pulled up, meaning that he was with four other guys. S.K. then posted to his stories "Let me pull up" with "K" under it and check boxes designated "yes" and "no." Instagram indicated that unbothered viewed the story, checked "yes," and posted an emoji. After S.K. saw unbothered's "yes," he texted her through Instagram. Unbothered gave her address as 12206 Maple Avenue, but said she was getting something to eat and would text him when he could come over. S.K. asked if unbothered had anyone with her. She responded she was with "the homegirls" and asked if he had anyone with him. S.K. responded that he was with his cousin.

At about 10:20 p.m., S.K. texted unbothered that he was coming over. S.K. asked if he could come into unbothered's house. Unbothered replied yes. S.K. then tried to video chat with unbothered but unbothered did not answer, so he texted unbothered to come outside. S.K. tried to video chat with unbothered again but got no answer. Unbothered texted asking where S.K. was, and S.K. responded "I'm outside." S.K. asked which house unbothered's was. At approximately 11:00 p.m.,

4

S.K. sent a video he took from inside the Range Rover where he panned the area to show unbothered his location. The video showed that it had been opened and viewed.

S.K. and his friends sat in the parked Range Rover for a couple of minutes. S.K. tried to call again, but unbothered did not answer. S.K. was turning off his phone when he saw a dark figure a few feet from the car, moving alongside it from back to front. The figure was close to the Range Rover on the driver's side. S.K. looked to see what was happening and the driver's side window shattered. He realized that someone was firing gunshots. He had not told anyone other than his mother that they were going to the Maple Avenue address. S.K. saw three figures. Two were on the sidewalk and one was in the street. All three were dressed in black. The person in the street wore a long-sleeved hoodie with the hood tied tightly so that only the person's eyes could be seen. None of the person's clothing had a logo on it. The person also wore gloves.

J.M. also saw the window shatter and heard about thirty gunshots. The first series of gunshots happened all in a row. J.M. estimated that the shooter was four feet away from the Range Rover. The shooter was wearing a hoodie with the hood pulled up. Hill started to drive away, and the shooter fired two more shots into the back of the vehicle. The Range Rover crashed into the back of a parked car. J.M. got out and tried to get help. He was able to get a resident to call the police.

Colquitt suffered four gunshot wounds. Hill suffered 12 gunshot wounds. Both died from their injuries.

## C.    *The Investigation*

Investigators obtained information on the Instagram account for "thaatsexyybitcchh".  It was registered to "Miniman" whose e-mail address was tkmini103@gmail.com.  Law enforcement records listed Byrd's gang moniker as "Mini Man."  The number 103 is associated with Grape Street, which includes 103rd Street in its territory.  The "thaatsexyybitcchh" Instagram account was associated with the cell phone number that was used to send texts to S.K. on the night of the shootings.

Surveillance video collected from nearby residences depicted a light-colored Chevrolet Equinox arriving and reversing into the driveway of 12206 Maple Avenue about 20 minutes before the shooting on October 15, 2020.  The video showed the Range Rover rolling forward and one person shooting into the driver's side window.  The shooter fell and a second suspect appeared.  The shooter then stood and fired additional bullets into the Range Rover as it departed.

Officers searched S.K.'s phone and found a photo of Brumfield displaying gang signs while standing in front of a light-colored Equinox with a distinctive bullet hole on the rear column on the driver's side of the vehicle.  They re-examined the surveillance video and noticed a defect in the exact same location on the Equinox that pulled into 12206 Maple Avenue prior to the shooting.

On November 5, 2020, an officer made contact with Brumfield at his residence and noticed a light-colored Equinox with a bullet hole in the driver's side rear column parked nearby.

On November 23, 2020, Officers observed Brumfield standing in front of a double-parked black Infiniti.  The doors of

6

the Infiniti were open. As the officers approached, Brumfield became startled. Brumfield reached toward the front passenger compartment and made furtive movements as if he was concealing a bulky item, then got up and closed and locked both doors. Brumfield took off running, but the officers did not pursue him because they already knew his identity and needed to secure the vehicle and the other person who was present. The officers saw a rifle in the passenger compartment partially covered by a sweater. The rifle was a semi-automatic, blue-steel bushmaster carbon fifteen with thirty rounds inside the magazine and one round inside the chamber. One of the officers discovered a blue-steel, semi-automatic nine millimeter handgun on the driver's side floor board. The gun was a "Polymer80" "ghost gun". It had one round in the chamber and 20 rounds in a drum magazine. A ghost gun is a gun that can be made at home and is unserialized and untraceable. The car registration reflected that Brumfield was the owner of the Infiniti.

Officers collected 16 shell casings and nine fired bullets related to the October 15, 2020 shooting. Two of the bullets were recovered from Colquitt's body and three of the bullets were recovered from Hill's body. All 16 shell casings matched the Polymer80 discovered in Brumfield's Infiniti. Nine of the 12 fired bullets were fired from the Polymer80 and the other three were too damaged to make a comparison.

All of the nine-millimeter casings recovered from the October 1, 2020 and October 8, 2020 shootings were also fired from the Polymer80, as was one recovered bullet.

A video clip of Byrd taken on Brumfield's phone on September 11, 2020, showed Brumfield driving and throwing gang signs. The video then panned to Byrd holding the

Polymer80. An October 21, 2020 photo of Byrd discovered on Brumfield's phone also depicted Byrd holding the Polymer80.

Cell phone records reflected that Byrd and Brumfield's phones were in the area of Maple Avenue near the time of the shootings, and in the area of Brumfield's house after the shootings.

## DISCUSSION

### A. *Conspiracy to Murder Instruction*

Byrd first contends that the trial court's conspiracy to murder instruction created a presumption that he was guilty as a coconspirator and improperly lessened the prosecution's burden of proof. The instruction referred to Byrd as "coconspirator Byrd" when describing each overt act he allegedly committed. Byrd complains that language effectively advised the jury that he was a coconspirator if it found any one of the overt acts to be true. Byrd argues that the jury had to presume he was a coconspirator, and consequently also had to presume that Byrd conspired to kill and intended to kill, which unconstitutionally lightened the prosecution's burden of proving the conspiracy to murder charge.

The People argue that Byrd forfeited this argument by failing to object to the instruction at trial. Alternatively, the People assert there is no reasonable likelihood that the jurors understood the instruction to establish a presumption that he was guilty of conspiracy to murder, and that any error is harmless beyond a reasonable doubt. Because Byrd contends the instruction removed an element of the offense from the jury's consideration, we must review his claim to determine whether his

8

substantial rights were affected. (*People v. Jimenez* (2016) 246 Cal.App.4th 726, 730.) We find no error as there is not a reasonable likelihood that the jury construed the conspiracy instruction as Byrd contends.

### 1.      **Legal Principles**

" 'When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citations.]" (*People v. McCarrick* (2016) 6 Cal.App.5th 227, 245.) " ' "[J]ury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution[.]" ' " (*People v. Dominguez* (2021) 66 Cal.App.5th 163, 183.) " 'The threshold inquiry in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine the nature of the presumption it describes.' [Citation.] The court must determine whether the challenged portion of the instruction creates a mandatory presumption, [citation], or merely a permissive inference, [citation]. A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." (*Francis v. Franklin* (1985) 471 U.S. 307, 313–314, fn. omitted.) "A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury

that the suggested conclusion should be inferred based on the predicate facts proved. . . .  A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury."  (*Id*. at pp. 314–315 .)

The crime of conspiracy "has four elements:  (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator."  (*People v. Ware* (2022) 14 Cal.5th 151, 163.)

### 2.    Proceedings

At Byrd's trial, the court instructed the jury on conspiracy to murder using a modified version of CALCRIM No. 563:

"The defendant is charged in Count 9 with conspiracy to commit first degree murder in violation of Penal Code section 182.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.  The defendant intended to agree and did agree with Ramaje Brumfield to intentionally and unlawfully kill;

"2.  At the time of the agreement, the defendant and the other alleged member of the conspiracy intended that one or more of them would intentionally and unlawfully kill;

"3.  The defendant or Ramaje Brumfield, or both of them committed at least one of the following overt acts alleged to accomplish the killing:

10

"a)  On or about the month of October 2020, *co-conspirator Tryon Byrd* controlled a fake Instagram account using his cell phone and/or other devices.

"b)  *Co-conspirator Byrd* used a fake persona that involved him pretending to be a female interested in romantic liaisons or other activity with unsuspecting male targets.

"c)  *Co-conspirator Byrd* made contact with target S[.]K[.] who was an acquaintance of co-conspirator Ramaje Brumfield's sister.

"d)  On October 15, 2020, *co-conspirator Byrd* used the fake Instagram account, posing as a female, to contact S[.]K[.] and arrange a meeting at a residence located at 12206 Maple Ave., Los Angeles.

"e)  On October 15, 2020, *co-conspirator Byrd* informed co-conspirator Brumfield that S[.]K[.] and at least one other person were coming to 12206 Maple Ave.

"f)  On October 15, 2020, *co-conspirator Byrd* and Brumfield lay in wait for about 20 minutes until victim S[.]K[.] and others arrived at 12206 Maple Ave.

"AND

"4.  At least one of these overt acts was committed in California.

"To decide whether the defendant committed these overt acts, consider all of the evidence presented about the overt acts.

"To decide whether the defendant and the other alleged member of the conspiracy intended to commit murder in the first degree, please refer to Instructions 520 (First or Second Degree Murder With Malice Aforethought) and 521 (First Degree Murder) which define that crime.

"When deciding whether the defendant and the other alleged member of the conspiracy intended to commit murder in

11

the first degree, do not consider implied malice.  Conspiracy to commit murder requires an intent to kill.

"The People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder.  The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime.  An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

"An overt act is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime. The overt act must happen after the defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.

"You must all agree that at least one alleged overt act was committed in California by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts.

"Someone who merely accompanies or associates with members of a conspiracy but who does not intend to commit the murder is not a member of the conspiracy.

"Evidence that a person did an act or made a statement that helped accomplish the goal of the conspiracy is not enough, by itself, to prove that the person was a member of the conspiracy."  (Italics added.)

### 3. Analysis

Here, the references to "coconspirator Byrd" created at most a permissive inference. The specific overt acts listed in the instruction were not elements of conspiracy to commit murder. Our Supreme Court has held that "the requirement of an overt act is an element of the crime of conspiracy in the sense that the prosecution must prove it to a unanimous jury's satisfaction beyond a reasonable doubt. But that element consists of *an* overt act, not a *specific* overt act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1134.) The element that the jury had to determine was whether "[t]he defendant, or Ramaje Brumfield, or both of them committed at least one of the [listed] overt acts alleged to accomplish the killing." Byrd was not referred to as a coconspirator in this regard, but rather as "the defendant." If the jury did find that Byrd committed one of the six alleged overt acts, the language of the instruction would, at most, "suggest[] to the jury a possible conclusion to be drawn if the State prove[d] predicate facts, but [it would] not require the jury to draw that conclusion." (*Francis v. Franklin*, *supra*, 471 U.S. at p. 314, fn. omitted.) It did not create a mandatory presumption of guilt.

Viewed in light of the conspiracy instruction as a whole, as well as the other instructions given, there is not a reasonable likelihood that the jury would have understood that if it found one alleged overt act to be true it followed that Byrd was guilty of conspiracy to murder regardless of whether the other three elements of the offense had been satisfied.

CALCRIM No. 563 instructed the jury that to find Byrd guilty of conspiracy, it must find all four elements of the crime

13

had been satisfied.  In addition, the instruction separately emphasized that "[t]he People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder."  CALCRIM No. 563 also specifically stated that, standing alone, a finding that Byrd committed an overt act was insufficient to prove his guilt:  "An overt act is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime."  "Evidence that a person did an act or made a statement that helped accomplish the goal of the conspiracy is not enough, by itself, to prove that the person was a member of the conspiracy."  Other than when describing the specific overt acts, the instruction did not refer to Byrd as "co-conspirator Byrd."  Rather, Byrd was referred to as "the defendant" and an "alleged member of the conspiracy."  Brumfield was referred to as "the *other* alleged member of the conspiracy," which also indicated that Byrd was alleged—not presumed—to have conspired.  (Italics added.)

The trial court instructed the jury under CALCRIM No. 220 that Byrd was presumed innocent and that the burden was on the People to prove his guilt beyond a reasonable doubt.  The trial court instructed the jury under CALCRIM No. 251 that "[t]he crimes charged in this case require proof of the union, or joint operation, of act and wrongful intent.  [¶] For you to find a person guilty of the crimes in this case, that person must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state.  The act and the specific intent or mental state required are explained in the instruction for that crime."  In other words, the jury was told that it was not sufficient to find that Byrd committed an overt act—it must also find that he intended to agree to kill and intended to kill, as

14

proscribed in CALCRIM No. 563.  The trial court did not err in instructing the jury on conspiracy to murder.

**B.**     *Evidence of Murder and Attempted Murder Convictions (Counts1-5)*

With respect to his convictions for murder and attempted murder, Byrd contends there is insufficient evidence to demonstrate beyond a reasonable doubt that (1) he was the actual shooter or (2) he directly aided and abetted the shootings. The contention lacks merit.

**1.     <u>Legal Principles</u>**

In reviewing the sufficiency of the evidence, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)  "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence.  [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 919.)  "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' [Citation.]" (*Cravens*, *supra*, 53 Cal.4th at p. 508.)  The standard of review is the same in cases in which a conviction is based primarily on circumstantial evidence.  (*People v. Clark* (2016) 63 Cal.4th 522, 625.)

"Murder is the unlawful killing of a human being . . . with malice aforethought."  (Pen. Code,[1] § 187.)  "Under California law, the elements of murder—that the prosecution, by definition, is required to prove beyond a reasonable doubt—are as follows:  (1) the defendant committed an act that caused the death of another person; (2) when the defendant acted, he had a state of mind called malice aforethought; and (3) he killed without lawful excuse or justification."  (*People v. Navarette* (2016) 4 Cal.App.5th 829, 843.)  "To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'  (*People v. Lee* (2003) 31 Cal.4th 613, 623 (*Lee*).)  When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim. . . ."  (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)

"A person who aids and abets the commission of a crime is culpable as a principal in that crime.  (§ 31.)"  (*People v. Gentile* (2020) 10 Cal.5th 830, 843.)  "[A]n aider and abettor's guilt 'is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state.'  [Citation.] ' "[O]nce it is proved that '[a] principal has caused an *actus reus*, the liability of each of the secondary parties should be assessed according to his own *mens rea*.' " '  [Citation.]"  (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)   "[A]n accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in

---

[1] All further statutory references are to the Penal Code.

16

achieving those unlawful ends.'  [Citation.]"  (*People v. Gentile*, *supra*, 10 Cal.5th at p. 843.)  "Thus, proof of aider and abettor liability requires proof in three distinct areas:  (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.  [Citation.]"  (*People v. Perez, supra*, 35 Cal.4th at p. 1225.)

### 2.    Analysis

Byrd divides his contention into two separate arguments (insufficient evidence of direct perpetration, insufficient evidence of aiding and abetting) based on his assumption that the jury could not find him guilty if it could not determine beyond a reasonable doubt which role he played in the crimes—shooter or aider and abettor.  This is not the law.  " ' "[A]s long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously . . . whether defendant was guilty as the aider and abettor or as the direct perpetrator. . . . [¶] . . . [¶] Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt.  Sometimes . . . the jury simply cannot decide beyond a reasonable doubt exactly who did what.  There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other."

17

[Citations.]' " (*People v. Smith* (2014) 60 Cal.4th 603, 618.)  Here, even if we assume it cannot be determined beyond a reasonable doubt whether Byrd was the actual shooter or an aider and abettor of the crimes, substantial evidence supports the conclusion that he is guilty.

> a.   Actus Reus *for Murder and Attempted Murder* (*Counts 1-5*)

Byrd does not contest that substantial evidence demonstrated he lured S.K. to Maple Avenue on the night of the crimes.  Byrd instead illogically suggests that, although he and Brumfield agreed to kill S.K. and intended to kill S.K., he lured S.K. to Maple Avenue so that Brumfield could merely shoot, but not kill, S.K.  Put another way, Byrd argues that, despite his intent, through his actions he aided and abetted a shooting rather than a murder.  The argument defies both the evidence and reason.  Nonetheless, Byrd attempts to bolster it by treating the evidence that he lured S.K. to the location of the shooting as proof of the conspiracy charge that cannot serve as evidence of the murders and attempted murders.

Byrd analogizes his case to *People v. Leon* (2008) 161 Cal.App.4th 149 (*Leon*).  In *Leon*, the defendant and a fellow gang member were burglarizing a car in rival gang territory when a witness yelled that the men should leave because he was going to call the police.  (*Id*. at pp. 153–154.)  In response, Leon's codefendant raised a gun in the air and fired it.  (*Id*. at p. 154.)  The witness left.  (*Ibid*.)  After Leon and his cohort fled the scene, Leon was found with ammunition and a firearm in his possession.  (*Id*. at p. 154.)  The jury found Leon guilty of

burglary, attempting to dissuade a witness from reporting a crime, and firearm offenses related to active gang participation. (*Id.* at p. 152.)  The Court of Appeal reversed Leon's conviction of intimidating a witness because there was insufficient evidence that he aided and abetted that crime.  (*Id.* at p. 159.)  The People argued that Leon and his cohort were members of the same gang, armed, and burglarizing cars in rival gang territory, and that Leon stared at the witness when his cohort fired the gun.  (*Ibid*.)  The appellate court found that, even assuming Leon could aid and abet his fellow gang member in witness intimidation by staring, there was no evidence that he had done so.  (*Ibid*.)  The court held that the evidence was insufficient to support Leon's conviction for aiding and abetting witness intimidation.  (*Ibid*.)  *Leon* is inapposite.  Leon was merely present when his codefendant intimidated a witness by shooting into the air.  There was no evidence that Leon intended to intimidate a witness—he went into rival territory with his cohort to commit burglary.  Nor was there any evidence that Leon knew his cohort would use a gun to intimidate the witness or that Leon took any action to facilitate the crime.

In contrast, here the crimes of conspiracy to murder, murder, and attempted murder are not unrelated.  Byrd was not simply a fellow gang member who was present at the scene of a shooting.  There is substantial evidence that he and Brumfield agreed to commit murder and intended to commit murder.  Byrd's act of luring S.K. to the scene of the shooting using a fake Instagram account to pretend he was a girl was "conduct . . . that in fact assist[ed] the achievement of the crime[s]."  (*People v. Perez*, *supra*, 35 Cal.4th at p. 1225.)  Moreover, Byrd did not only lure S.K. to the shooting, Byrd knew that S.K. had at least one

19

other companion with him, and possibly more, and Byrd lured S.K.'s companions to the shooting as well. Byrd obtained an exact location for the Range Rover when it arrived. The attempted murder victims testified, and surveillance video showed, that more than one person approached the vehicle. It is reasonable to infer that Byrd was one of those people, along with Brumfield. Cell phone evidence placed Byrd and Brumfield in the area and demonstrated that Byrd left with Brumfield afterwards. Substantial evidence supports the conclusion that, at a minimum, Byrd aided and abetted the crimes.

The prosecution also presented evidence that suggested Byrd may have been the shooter. A photo and a video on Brumfield's phone depicted Byrd holding the Polymer80 that was used in the shooting. The video of Byrd was taken a few weeks before the shooting and the photo was taken only six days afterwards. Byrd argues that no one saw him with the gun during the shooting and his fingerprints were not on the Polymer80. He claims that the photographic and video evidence merely suggests he was "aware" of the gun. But the evidence does much more: it demonstrates that Byrd had possession of the gun both before and after the shooting. That evidence, combined with the substantial evidence that Byrd aided and abetted the crimes, provided a basis for the jury to reasonably infer that Byrd was the shooter. Even assuming, however, the evidence falls short in proving Byrd was the shooter, it supports the reasonable inference that either Byrd or Brumfield was the shooter, and if the shooter was Brumfield, Byrd's actions aided and abetted the shooting.

*b.*     Mens Rea

i.     Attempted Murder (Counts 4, & 5) [2]

At trial, the prosecution theorized that Byrd had the requisite intent to be guilty of the attempted murders of D.J. and J.M. in counts 4 and 5 under the "kill zone" theory. "[T]he kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*People v. Canizales*, *supra*, 7 Cal.5th at p. 607.) "In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance

---

[2] Byrd concedes that substantial evidence supports the finding that he and Brumfield intended to kill S.K., so we do not discuss the intent requirement in count 3 for the attempted murder of S.K.

21

between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Ibid.*)

Here, the circumstances of the offense demonstrate that the shooter, whether Brumfield or Byrd, intended to create a zone of fatal harm. Byrd does not contest that the shooter knew that there was more than one person in the vehicle. The shooter used a semi-automatic weapon. He fired 16 shots into a vehicle with five occupants from a distance of only two to six feet away. Both D.J. and J.M. were in the kill zone, sitting in the back seat of the Range Rover next to S.K., the intended target.

There is also substantial evidence to support the finding that, even if he was an aider and abettor and not the shooter, Byrd knew that the shooter intended to kill everyone in the vehicle in order to kill S.K. Byrd had possessed, and was familiar with the gun the shooter used, and it can be reasonably inferred Byrd knew its capabilities. The evidence of uncharged crimes showed that Byrd was with Brumfield at the scene of two prior Bounty Hunter murders, which occurred only weeks before the instant shooting. In both instances the shooter fired numerous bullets, which struck objects all around the victims. Even if we assume Brumfield and not Byrd used the Polymer80 in those crimes, Byrd was nonetheless familiar with this pattern. Byrd knew that at least one other person was in the Range Rover. It is reasonable to infer that he shared this information with Brumfield. The evidence also indicates that Byrd and Brumfield approached the vehicle together—i.e., both knew that the shooting was to take place at close range. In sum, even if Byrd aided and abetted and was not the actual shooter, he had all of the information that the shooter did, and the jury could reasonably infer that he knew Brumfield's intent was to kill

everyone in the vehicle in order to ensure S.K.'s death. It can further be inferred that Byrd shared Brumfield's intent—he lured S.K. and his companions to the scene, approached the Range Rover at close range with Brumfield, and left the scene of the shooting with Brumfield afterwards.

ii.    Murder (Counts 1 & 2)

"The element of malice aforethought . . . encompasses two alternative mental states, express malice and implied malice, which must be formed before the act that causes death is committed." (*People v. Navarette*, *supra*, 4 Cal.App.5th at p. 843.) "[A] defendant acted with express malice if he unlawfully intended to kill." (*Ibid*.) "Express malice does not mean an intent to kill a *specific person*; it is defined as the intent to unlawfully kill *a* person. 'Malice is express when there is manifested a deliberate intention to unlawfully take away the life of *a* fellow creature.' (§ 188, subd. (a)(1), italics added.) . . . [L]iability for express malice murder does not require a finding that the defendant specifically intended to kill the deceased victim(s). 'A defendant can be liable for the unlawful killings of both the intended victims and any unintended victims. . . . [Citation.]' [Citation.]" (*People v. Nguyen* (2024) 103 Cal.App.5th 668, 679–680.)

Here, Byrd does not challenge for insufficient evidence his conviction of conspiracy to murder. The jury's finding that he intended to kill in conjunction with that count satisfies the requirement that Byrd intended to kill as to the murder victims in counts 1 and 2, regardless of whether Byrd was the shooter or a direct aider and abettor.

23

The evidence also supports the conclusion that Byrd intended to kill the victims independent of his intent to kill S.K. Byrd knew that at least one other person was in the vehicle with S.K. and lured them all to the shooting. That and the manner in which the shooting was conducted—at close range with numerous bullets fired—showed that Byrd intended to kill everyone inside the Range Rover, regardless of their specific identities.

For Byrd to have the mental state to be liable as a direct aider and abettor he must additionally have known that Brumfield intended to kill. The jury found that Byrd and Brumfield agreed to commit murder in connection with the conspiracy to murder charge. Byrd had to know that Brumfield intended to murder in order to agree to commit murder with him. Byrd and Brumfield ran toward the vehicle together, and, as in the two uncharged crimes, the shooter fired the gun numerous times. The evidence tends to show that if he was not the shooter, Byrd knew Brumfield intended to kill everyone in the vehicle. Accordingly, the second mens rea requirement for murder as an aider and abettor is also satisfied.

## C.    *Liability for Premeditated Murder of All Persons Killed*

Byrd contends that, even if substantial evidence supports the murder convictions in counts 1 and 2 on an aiding and abetting theory, the convictions must be reduced to second degree murder because premeditation cannot be transferred from an intended victim to an unintended victim. Byrd concedes that the jury was not instructed on "transferred premeditation," yet

24

advances the specious argument that the theory was "the best fit." We reject the contention.

Byrd's argument that he did not act with premeditation assumes that there was insufficient evidence to show that he intended to murder Hill and Colquitt in addition to S.K. As we discussed in the previous section, the prosecution introduced substantial evidence that Byrd intended to kill everyone in the vehicle. The same evidence—Byrd's knowledge that there was at least one other person in the Range Rover and the manner of the shooting—also supports the jury's finding that Byrd had the opportunity to consider whether to kill all the occupants of the vehicle and made a cold calculation to do so, whether as the actual shooter or as an aider and abettor.

Byrd also argues that the statement in CALCRIM No. 521 that "[t]he defendant acted with premeditation if he decided to kill before completing the acts that caused death" may have lead the jury to find that he committed first degree murder based on Brumfield's mental state. The argument rests on another invalid assumption that we previously addressed—that the evidence showed Brumfield was the shooter and Byrd aided and abetted the crimes. Under the evidence presented either Byrd or Brumfield may have been the shooter. The jury did not have to agree which role Byrd played. The instruction was correct in law and responsive to the facts. Byrd failed to preserve this argument because he did not object to the wording of the instruction or request clarification in the trial court. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1223 [failure to object to instruction that is correct in law forfeits the issue on appeal].)

Moreover, the jury would not have understood the instruction to refer to Brumfield's intent. CALCRIM No. 521

stated in part: "*The defendant* is guilty of first degree murder if the People have proved that *he* acted willfully, deliberately, *and with premeditation. The defendant* acted willfully if *he* intended to kill. *The defendant* acted deliberately if *he* carefully weighed the considerations for and against *his* choice and, knowing the consequences, decided to kill. *The defendant* acted with premeditation if *he* decided to kill before completing the acts that caused the death." (Italics added.) The instruction repeatedly emphasized that the jury was to consider Byrd's mental state, not Brumfield's.

Byrd also argues that the prosecutor's closing remarks may have improperly led the jury to believe that it could find he acted with premeditation under a "transferred premeditation" theory. He forfeited this argument by failing to object to the prosecutor's argument at trial. (*People v. Ervine* (2009) 47 Cal.4th 745, 794.) The argument also lacks merit. Byrd finds fault with portions of the prosecutor's closing argument stating that the victims were all lured to Maple Avenue. As we have discussed, evidence was presented that Byrd lured S.K. and his companions to the shooting and that both the aider and abettor and the shooter knew how the shooting would be carried out in advance— substantial evidence showed that Byrd and Brumfield planned to kill everyone in the vehicle using a semi-automatic weapon at a close range, firing numerous bullets into the vehicle. Byrd also complains that his actions and Brumfield's were commingled in the closing statement, but, as we have discussed, either Byrd or Brumfield may have been the shooter, and the evidence presented demonstrated that Byrd personally lured S.K. and his companions to the shooting. There was nothing misleading about the prosecutor's argument. The prosecutor did not suggest that

26

the jury could rely on "transferred premeditation." Nor was it necessary for the jury to rely on a theory of "transferred premeditation" to determine the degree of murder. Substantial evidence showed that Byrd not only engaged in a ruse to lure S.K. to the shooting; it also demonstrated that he knew at least one other person was present. Byrd had the opportunity to consider whether to kill everyone in the Range Rover and made a deliberate decision to do so, either as the shooter or as an aider and abettor.

To summarize, the jury was properly instructed under CALCRIM No. 521 that to find Byrd guilty of first degree murder it must find that he acted willfully, deliberately, and with premeditation. Nothing in the instructions or closing argument suggested otherwise. The jury is presumed to understand and abide by the instructions that the court gives. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.) We cannot conclude that the jury ignored legally correct instructions that were responsive to the evidence and instead applied a theory of "transferred premeditation" upon which it was not instructed.

**D.** *Liability for Attempted First Degree Murder Even if Byrd Did Not Personally Premeditate*

Section 664, subdivision (a) provides that if an attempted murder is willful, deliberate, and premeditated, a person who is found guilty of the attempt shall be sentenced to life in prison without the possibility of parole. Here, the jury was instructed under CALCRIM No. 601 that it could find the attempted murders were done willfully, deliberately, and with

27

premeditation if either Byrd or Brumfield acted with that state of mind.

Byrd contends that he should not be subjected to life terms for his convictions for attempted first degree murder in counts 3, 4, and 5 because the jury did not find that he personally premeditated the attempted murders. Byrd acknowledges that the California Supreme Court has held that, because a direct aider and abettor "necessarily acts with knowledge of the direct perpetrator's intent to kill and with a purpose of facilitating the direct perpetrator's accomplishment of the intended killing[,]" the defendant may be liable for first degree attempted murder even if he does not personally premeditate the attempted murder. (*Lee*, *supra*, 31 Cal.4th at pp. 621–625.) Byrd instead argues that in promulgating Senate Bill No. 1437 (2017–2018 Reg. Sess.) and Senate Bill No. 775 (2021–2022 Reg. Sess.), the Legislature intended to abrogate imputed premeditation for attempted murder.

We disagree. The Legislature passed Senate Bill No. 1437 "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The amendments that Senate Bill No. 1437 made to sections 188 and 189 provide relief only where a defendant has been convicted under a theory of imputed malice, not imputed premeditation. (§ 1172.6, subd. (a).) Byrd's argument that premeditation "involves" express malice does not aid him. Whether a crime was committed with express malice is a separate consideration from

28

whether it was premeditated.  (See *People v. Smith* (2005) 37 Cal.4th 733, 740 [attempted murder requires specific intent to kill, and the prosecution may seek an additional finding of premeditation "for purposes of sentence enhancement"].)  Here, the jury was instructed under CALCRIM No. 600 that it must find Byrd had the intent to kill to find him guilty of attempted murder.  The jury's finding that the attempted murders were premeditated did not undermine its finding that Byrd personally acted with express malice in committing the attempted murders, as the amendments to sections 188 and 189 require.

Senate Bill No. 775 relates to petitions for resentencing pursuant to section 1172.6, not direct appeals.  Regardless, it also addresses imputed malice, not imputed premeditation, and applies only to attempted murder charges prosecuted under the natural and probable consequences doctrine, which was not implicated here.

We reject Byrd's argument that his personal premeditation must be determined under the United States Supreme Court's holdings in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and *Alleyne v. United States* (2013) 570 U.S. 99 (*Alleyne*), which require that the existence of any fact other than a prior conviction that increases punishment must be submitted to the jury and found beyond a reasonable doubt.  *Apprendi* and *Allyene* are not implicated here.  The jury determined that the attempted murders were willful, deliberate, and premeditated, which is the relevant factor for consideration under section 664, subdivision (a).  Under *Lee, supra*, 31 Cal.4th 613, the jury was not required to consider whether Byrd personally acted willfully, deliberately, and with premeditation for punishment to be increased.

We also reject Byrd's argument that our Supreme Court's decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*) "started a trend against imputed premeditation." *Chiu* held that aider and abettor liability for premeditated attempted murder must be based on direct aiding and abetting principles rather than aiding and abetting under the natural and probable consequences doctrine. *Chiu* concerned the impact of imputed intent on premeditation. It addressed premeditation only in cases where intent had been imputed. Byrd was convicted under the theory that he was either the perpetrator or a direct aider and abettor, not under the natural and probable consequences doctrine. Malice was not imputed to him.

The authorities discussed above do not conflict and do not leave unresolved the issue of whether a greater penalty may be imposed for attempted murder on the basis that the murder was premeditated, even if an aider and abettor did not personally act with premeditation. We see no need to address the issue that our Supreme Court already decided in *Lee, supra*, 31 Cal.4th 613.

## DISPOSITION

We affirm the trial court's judgment.

NOT TO BE PUBLISHED.

MOOR, J.

WE CONCUR:

HOFFSTADT, P. J.

KIM (D.), J.